# Case No. 12,572a.

## The SEA BREEZE.

[2 Hask. 510.] [1]

District Court, D. Maine.   July, 1881.

TOWAGE — DAMAGE TO TOW — LOOKOUT — DUTY OF TOW — COLLISION — MUTUAL FAULT.

1. A tug with a tow is in fault from attempting a dangerous course when a safe one is equally convenient.

2. The master of a tug, when aware of danger to the tow, is not excused by calling to the master of the tow to change her course; but, if possible, is required to promptly change the course of the tug under full head of steam to thereby avoid the threatened peril of the tow.

3. A tug with a tow is required to have a lookout beside the master, acting as pilot in the wheelhouse and at the wheel.

4. The master of the tow is required to follow the guidance of the tug; and, when directed to follow in the wake of the tug, is in fault in not

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

having a lookout forward, charged with the duty to observe whether the tow does so follow.

5. In cases of collision, when both vessels are in fault, the damages are divided.

In admiralty. Libel in rem by the owners of the schooner Sea Breeze against the steam tug Ellen, to recover the value of the schooner, sunk in Saco river from the alleged fault of the tug while having her in tow. The owners of the tug filed their claim and answer and denied all fault on the part of the tug, but alleged the disaster occurred from the fault of the master of the schooner, in not following in the wake of the tug as he was directed to do.

Geo. F. Holmes, A. A. Strout, and J. C. Dodge, for libelants.

Hanno W. Gage, Wilbur F. Lunt, and S. C. Strout, for claimants.

FOX, District Judge. This schooner was sunk in the Saco river, whilst in tow of the tug, by reason of striking against the government pier on the evening of April 10th; and this libel is prosecuted for the recovery of the value of the schooner. The accident occurred about eight o'clock; the tide was nearly full with about a foot freshet; the evening was clear, the moon shining. It is not claimed by either party that the accident was inevitable; and it is manifest that one or both parties were in fault. The schooner is 142 tons burden, was loaded with coal, consigned to York Manufacturing Company, to be delivered at Island wharf, Saco. She arrived April 9th, at Wood Island, and came to anchor there about a mile distant from the bar at the mouth of the Saco river. The tug that evening attempted to take her over the bar, but did not succeed, and the schooner was taken to her anchorage. The next evening, about six, the tug returned, and her master, having measured, reported the schooner was drawing eleven feet and four inches; he again took her in tow and proceeded toward the bar. The master of the schooner says she in fact then drew but eleven feet two inches; but this discrepancy is not very material. The schooner was fastened to the tug by a hawser or tow line of about thirty fathoms, and the captain of the tug informed the master of the schooner that, after they were over the bar, he would set a light on the flag staff of the tug for the schooner to steer by, which was done. Having crossed the bar without difficulty, they proceeded up river at the rate of about four knots per hour. The distance from the mouth of the river to Saco is seven or eight miles. The river is very circuitous and variable, sometimes quite narrow and then again, in a short distance, it doubles its width. The channel also varies very much, being sometimes on the Saco shore, and in a short distance, crossing to the Biddeford side. The main channel ordinarily is from 150 to 200 feet wide, and has at high tide a depth

of twenty-five feet or more. The pier on which the schooner struck is on the Saco side, about a mile below that village, and was built by the government upon a point of rocks which projected into the river. The pier is made of logs, is about ten or twelve feet in width at the end, and extends into the river sixty-five or seventy feet from the shore. From the end of the pier to the Biddeford shore is a little more than 400 feet. Just above the pier, the river makes a quick turn to the eastward, widening to the extent of 700 feet. Nearly in the middle of the river, above the pier, is a spit which projects down river in the direction of the pier; but at the time of the accident, there was a depth of at least twelve feet of water in all directions for a distance of more than 200 feet from the pier, and there was no part of the spit over which the tug at the time could not have passed without difficulty. This pier had fallen into decay, was covered by water, with the exception of a small part of its shore end, which, as one of the witnesses described it, appeared at that time like a raft of logs. The master of the tug had, for many years, been sailing upon the river, and was well acquainted with it; none of those on board the schooner had ever before been on the Saco. Shortly after passing the stone wharf, which is on the Biddeford side down river about 1,000 feet distant from the pier, the channel makes a sharp turn across the river, close to the pier, and so continues its course up river, well into the eastern bend, setting over toward the Saco shore, between the spit and river bank. On this occasion, the tug and schooner were near to the stone wharf, and the tug then undertook to cross in the channel over by the pier. The master says he slowed down to two and one-half miles per hour after he had completed his turn from the stone wharf, and he steadied his wheel, and, as he looked behind from his wheel house, he saw the schooner, instead of following the tug, first swing to port, and soon after, on looking from the side window, he found she was swinging fast to starboard; that at this time he had passed the end of the pier, at a distance of fifty-seven feet; that, finding the schooner did not follow the tug, he cried out to those on board the schooner to starboard; but the order was not obeyed, and the schooner struck almost immediately against the pier; that he did nothing to prevent her striking, after he found the schooner was in danger, as it would have been of no avail. It is claimed that, under these circumstances, the tug was in fault in various particulars, for which she should be held chargeable for the damages.

1. It is said that the tug was too close into the pier; that knowing the pier was there submerged, and its dangerous proximity, it was the duty of the tug to have passed the pier at a greater distance, and by not so doing her master is chargeable with negligence. The master of the tug says that ordinarily he

passed about thirty feet distant from the pier, but that on this occasion he was fifty-seven feet off; and there is testimony from experts that it was customary to pass within thirty feet of the pier. It is merely matter of opinion, of the master of the tug, how far off he was when he passed the pier; he is an owner of a portion of the tug, and personally accountable for his neglect, is deeply interested in this controversy, and his judgment, therefore, must be received with great allowance, under the circumstances. He is contradicted by the master of the schooner, who says that the schooner followed the tug, which passed in safety, but could not have been fifty-seven feet off, for, if she had been, the schooner, although somewhat wider than the tug, would have gone thirty or forty feet outside of the pier. The result shows, I think, that the master is in error as to how far he passed from the pier, and that, in all probability, he was not more than some twenty feet off, instead of fifty-seven, as he would have us believe. There was no occasion for the tug to pass even within fifty-seven feet of the pier; as it drew but seven or eight feet of water, it could have gone up into the upper end of the spit, if necessary, in making the turn, and could certainly have found no difficulty in giving the pier a berth of one hundred fifty feet, instead of fifty-seven, if the master had chosen so to do, as the channel was at least twelve feet deep for over two hundred feet from the pier. The tug, therefore, was under no necessity of taking a course so near the pier as to expose the schooner to danger. It could with equal safety have gone much farther off, and thereby ensured a safe course for the tug; it not having done so, was guilty of negligence and want of care, and must, therefore, be held chargeable for the damages resulting therefrom; having chosen a path of peril and danger when one of safety was at hand, it must abide the consequences. It is said that, in the opinion of experts, it was safe to run within twenty or thirty feet of the pier, and that this had been usual and customary. The answer to this suggestion is, that these parties may have reason to congratulate themselves on their good fortune in so passing without injury; but the result affords no justification for attempting a dangerous course. when a safe one is equally convenient.

2. In another respect, I hold the tug was in great fault. The master of the tug admits that some short time prior to the accident, about one-fourth of a minute as he says, he perceived that the schooner was setting over towards the pier. and gave orders to her, to starboard. Those on board the schooner had no knowledge that the pier was there, or that they were in danger; but the master of the tug, from his long experience upon the Saco, must have been fully conscious of her peril; about all that he did to avert it was a simple order to the schooner to change her helm. The tug was at a slow speed; it had sufficient room in any direction to withdraw the schooner from her threatened peril, but nothing was done by the master of the tug in this behalf. If he had put on full steam and swung his boat sharply to port, he would, in all probability, have controlled the direction of the schooner and prevented the accident. It was certainly a very great error on his part not to have made the attempt.

3. There was no lookout on the tug; her crew consisted of her master, engineer and a boy. The engineer, of course, was below, and his attention was given to his engine. What duties the boy discharged are not shown; but it is not claimed that he acted as a lookout. The master was in the wheel-house, acting as pilot, wheelsman, and a lookout, as far forth as was practicable; but it is manifest that one man could not discharge all these duties; he could not, at the same moment, properly attend to the steering of the tug, giving directions to the engineer, and discover all that could be seen by him, if he had been on duty merely as a lookout. It is not improbable that, if his sole attention had been given to this duty, he would have found that he was much nearer the bank than he intended to be, and could have seen that the schooner did not follow the course of the tug, and thus the injury would have been prevented. In the evening, although it may be moonlight, one is apt upon a river to be deceived as to distance by the mist and the shadows of the trees on the river bank; and prudence required that there should be some person on board the tug, other than the wheelsman, to attend to the duties of a lookout.

4. In other respects, it is claimed that the tug was in fault; but it is unnecessary for the court here to pass upon these, as, for the causes above detailed, the tug is held accountable.

5. It remains to be determined whether the schooner was also negligent; for, if she was in fault, the damages must be divided. The master of the schooner was at the helm at the time, and had been there for nearly an hour; his orders from the tug were to follow the light; and "it was the duty of the schooner to follow the guidance of the tug, to keep as far as possible in her wake, and to conform to her directions." In my opinion, the schooner failed to comply with these requirements. It is shown that, after crossing the bar, there is a narrow passage of only seventy-five feet between some small islands, and that, when going through this passage, the master of the schooner, instead of following the light of the tug, attempted to cut across her course, thereby exposing the schooner to the danger of running ashore, which was only prevented by obeying an order from the tug to change her course. The master of the schooner says that, after they passed the stone wharf, he followed the light of the tug as near as practicable. This is denied by the master of the tug, who swears that he first saw the schooner over on his port side, and then swinging quickly to starboard, and that she went so far to star-

board, that he saw from the tug the port side of the schooner. The master of the schooner is also a part owner, and testifies under an equal interest with the master of the tug, and the court, therefore, must examine the testimony from other sources for corroboration of the witness. Bennett, one of the crew of the schooner, was sent forward by the master to keep a lookout for logs and ice, and he testifies that the schooner followed in the wake of the tug as near as he could judge; his attention does not appear to have been called to the course of the schooner; he had no orders to observe her course and notice whether she followed the wake of the tug, and the court does not find any very decided corroboration of the master's statement, either in his testimony or that of Frank B. Douty, who had but little idea of the course of the schooner, as he was not aware that they came up on the western shore, and did not notice that the tug had slackened her speed. Various witnesses of intelligence and respectability have been called, who testify to declarations made at various times by the master of the schooner, which, if made by him, are quite inconsistent with his evidence. The court cannot doubt that the substance of these statements is fairly represented. Taking all this testimony as to the declarations of the master, all of which are denied by him, it would appear that, for some time after the accident, he made no claim against the tug, did not charge her as being in fault by keeping too near the pier, but he rather acknowledged that he did not follow the tug, but attempted to cut across her course. The court is well aware that, in admiralty causes, the admissions of the crews of the respective vessels are not of the most satisfactory and reliable nature; but, in the present instance, they are shown to have been made by an intelligent ship-master, who was also a part owner of his vessel; and they relate to his own conduct at the time of the disaster. Under the circumstances, there being this conflict in the testimony of the masters of the respective vessels, the evidence of the master of the tug, that the schooner did not follow the tug, is sustained by the admissions of the master of the schooner, so that, on this branch of the case, the balance of testimony is against the schooner, and I, therefore, find that, by the neglect of her master to follow the tug, he also contributed to the disaster.

6. In another respect, the schooner was in fault. Bennett was put on the lookout with directions to watch the logs and ice, but no instructions were given him to attend to the vessel's course, and see that she followed the tug, and to notify the master if he failed to keep her on her proper course. If Bennett had been directed so to act as lookout, such would have been his duty; his attention would have been called to the course of the tug, and the necessity of following it: and, in case of any failure so to do, he should at once have informed the wheelsman, who would put her on her true course. In the opinion of the

court, a suitable lookout, attentive to his duties, would have prevented the disaster.

Both parties in fault. Damages divided.